FRANK E. TAPLIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CHARLES F. TAPLIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

A. P. KING, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 13254, 21264, 21263. Promulgated July 11, 1928.

*C. F. Taplin, Esq.,* for the petitioners.
*Alva C. Baird, Esq.,* and *J. Arthur Adams, Esq.,* for the respondent.

OPINION.

LITTLETON: With the exception of the statute of limitations issue raised in the appeal of Frank E. Taplin, Docket No. 13254, there are only two questions presented in these proceedings, namely: (1) Whether or not the purchase by these petitioners on October 30, 1920,

from the Cleveland Company of 5,400 shares of the stock of the Standard Company resulted in the receipt by them of a dividend and taxable income; and (2) whether or not the fair market value of the stock of the Standard Company on October 30, 1920, was less than $30 per share, the value thereof as determined by the respondent. If the petitioners prevail upon either issue judgment must be entered for them.

At the outset we may dispose of the statute of limitations issue raised in the Frank E. Taplin appeal. The Revenue Act of 1926, section 277(a)(3), provides that the taxes imposed by the Revenue Act of 1918 shall be assessed within five years after the return was filed. The respondent mailed to petitioner Frank E. Taplin a notice of the proposed deficiency before the expiration of five years after the filing of the return, and within 60 days Taplin filed with this Board this appeal from the determination of said deficiency. Thereby the Commissioner was prevented from making an assessment or collection of the proposed deficiency and the running of the statute of limitations was suspended, and remains in abeyance pending the determination by the Board of this appeal. Revenue Act, 1926, sections 274(a), 283(a), 277(b) and 278(d). It is apparent, therefore, that the five-year period allowed the Commissioner for making an assessment has not expired and that the assessment and collection of the deficiency are not barred, although no consent to a later assessment and collection has been entered into by the petitioner and the Commissioner.

The issue which is common to all of the proceedings and which is the real issue in the case is whether the petitioners are taxable on account of the receipt by them in 1920 from the Cleveland Company of 5,400 shares of stock of the Standard Company. Of this stock, 3,850 shares were acquired by the Cleveland Company, of which the petitioners were stockholders, without cash consideration, the only consideration appearing in the record being the making of a loan by the Cleveland Company to the Standard Company. How much or how little value there was to this consideration we have no evidence, though it does appear that the loan was later repaid with interest. Two hundred and fifty shares were acquired in 1918 for $310 and 1,300 shares in 1920 for $37,550. The price paid per share in 1920 ranged from $20 to $30 per share, and 1,150 shares of this total were acquired in July and October at $30 per share. On October 30, 1920, the date of the last acquisition of this stock at $30 per share, the Cleveland Company transferred the 5,400 shares to the petitioners for $37,860 which is equal in amount to the cash paid on account of the 250 shares acquired in 1918 and the 1,300 shares acquired in 1920, or an average of approximately $7 per share. Did this transaction result in taxable income to the petitioners?

To state our proposition differently: Since taxable income does not ordinarily flow to a taxpayer by reason of a purchase and since the petitioners contend that the transaction in question represented a sale by the corporation in which they were the purchasers and from which no taxable income arose, do we have here a sale in the sense that, for income-tax purposes, a gain or loss might have been computed? Was this a transaction carried out at arm's length in such a manner that the tax liabilities of the corporation, the alleged seller, and particularly the petitioners, the alleged buyers (for we are here concerned only with their tax liability) may be determined on the basis that 5,400 shares of stock of the Standard Company were sold by the Cleveland Company to the petitioners for $37,860? The effect of the petitioners' contention is to give an affirmative answer to this question, but we are unable to agree with this position.

In the first place, the transaction was between a corporation and its stockholders who held 6,914 shares out of a total of 10,000 shares and dominated this corporation. The remaining shares of the corporation were held by members of their family and an employee of the corporation and his wife. This of itself would not prevent this transaction from being considered a sale as between separate and distinct parties, since the fact that a corporation is separate and distinct from its stockholders is too well settled to admit of controversy. But because of the necessary close relationship which exists between a corporation and its stockholders, transactions between them may be examined to determine whether the parties were dealing with each other in the manner which is usual in open bargaining and whether proper regard was had to the value of the property involved and the consideration given therefor. As we said in *M. I. Stewart & Co.*, 2 B. T. A. 737, " In the case of corporations sales to stockholders in all cases are subject to special scrutiny and their good faith must be unquestioned." That is, where necessary, we may look through the form to the substance and view the transaction in its true light. We may " look beyond the surface facts and inquire into the real nature of the transaction in question, that it may be dealt with as it is in fact, and not as it has, for improper purposes been made to appear." *People* v. *Albany Insurance Co.*, 92 N. Y. 458.

In the case at bar, what was the situation with respect to the value of the stock which passed from the corporation to the stockholders for an alleged consideration of $37,860? Did this represent its value or even an approximation of its value? The amount which these stockholders gave for the 5,400 shares—except $310—was equal to the amount paid by the corporation for 1,300 shares during the seven months preceding the purported sale in question. The price paid for the last four purchases, or a total of 1,150 shares, was $30 a share.

The approximate price at which it was transferred to the majority stockholders was $7 a share, or less than one-fourth of the acquisition cost of shares on this same date. The petitioner who made the purchases for the corporation testified that the price paid of $30 a share was not representative of the value of the stock, but was paid in order to eliminate an objectionable minority. This statement is difficult of reconcilement with the further statement that purchases were made from the minority interests when they became " hard pressed " for money and desired to sell. To pay to objectionable minority stockholders who were in financial straits, and who desired to sell, approximately $37,000 for stock which had a value of only approximately $9,000, presents a degree of generosity which is most unusual and uncommon. .

It appears further that while the Standard Company did not show book profits for 1918 and 1919, the total results of operations for 1917, 1918, 1919, and 1920, as disclosed by its books, showed profits in excess of $300,000 before deducting income and profits taxes of approximately $130,000. The audit, however, as made by the Commissioner showed substantial profits for each of the years and a total profit for the four years of approximately $700,000 before deducting income and profits taxes for these years. No dividends had been paid by the Standard Company from 1917 to the date of the transaction in question on October 30, 1920. It is true that the year 1920 was undoubtedly a year of abnormally high prices in the coal industry and the further fact exists that the time within which it could reasonably have been expected that the coal mines owned by the Standard Company could have been operated profitably after 1920 was limited to a short period of years, but certainly had the results of operations for 1920 been taken as a criterion of value along with the supply of coal yet to be mined, a price far in excess of $30 a share would have been considered the fair market value of this stock. Under the petitioners' contention the fair market value of the entire capital stock of the Standard Company, 6,000 shares, would be $42,000, which is but a small percentage of the accumulated profits from 1917 to 1920, inclusive, whether we take the book figures or the results of the Commissioner's audit.

We do not consider it material in this instance that the purported sale was not made to all of the stockholders. Those who did not share in what we consider a distribution of profits were either of the same family or were connected with the corporation on account of employment. To say that they may have rights of action against the majority stockholders or the corporation because of this apparent inequitable distribution or to speculate as to how these rights may have been otherwise satisfied, would be extending our discussion beyond the requirements of this case.

In view of the foregoing circumstances and taking into consideration all of the evidence in this case, the Board is of the opinion that the transaction in question was not a *bona fide* sale in the sense that the parties were dealing at arm's length and in which the consideration named was the measure of the value of the stock purported to be sold. The Commissioner considered the difference between the amount paid by the petitioners for this stock, $37,860, and what he considered the fair market value of the stock, $162,000 (5,400 shares at $30 a share), as a distribution of profits and taxable in accordance with Treasury Decision 3435, which reads as follows:

Where property is sold by a corporation to a shareholder or member, or by an employer to an employee, for an amount substantially less than its fair market value, such shareholder or member of the corporation or such employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value. In computing the gain or loss from the subsequent sale of such property its cost shall be deemed to be its fair market value at the date of acquisition.

Whether the foregoing regulation would be upheld in its broadest sense under all of the circumstances which it might be interpreted to cover, it is unnecessary for us to determine. Suffice it to say that in this instance the Board is of the opinion that on the date when the stock in question was transferred by the Cleveland Company to the petitioners, its fair market value was not less than $30 a share and that the difference between this value and the consideration paid therefor by the petitioners was a dividend distribution and taxable to them as such.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

VAN FOSSAN, dissenting: I am unable to agree with the prevailing opinion of the Board. The respondent, relying upon Treasury Decision 3435, which has been incorporated in Internal Revenue Regulations 65 and 69 as a part of article 31, determined that the difference between the fair market value of the stock of the Standard Company on October 30, 1920, and the amount paid therefor by the petitioners constituted a dividend and taxable income to them. The pertinent part of the regulation is:

Where property is sold by a corporation to a shareholder or member, or by an employer to an employee, for an amount substantially less than its fair market value, such shareholder or member of the corporation or such employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value. In computing the gain or loss from the subsequent sale of such property its cost shall be deemed to be its fair market value at the date of acquisition.

In this case the petitioner acquired by purchase from the Cleveland Company property of value. In the record of the case I find

no evidence that the sale was fraudulent or fictitious or not in good faith. The conclusion of the majority to the contrary seems to me to be based on an inference that does violence both to the evidence and to reason. The petitioners paid for the property the price demanded by the corporation. Stockholders may contract and otherwise deal with the corporation as freely and validly as may any individual. In some cases, because of particular facts and circumstances, their dealings may be subjected to special scrutiny, but there is no presumption that the transaction is fraudulent, or *mala fides*, or invalid, merely by virtue of the relationship existing between the parties. *Fraus est odiosa et non praesumenda* is an old maxim of the law. The majority holding that the sale was not bona fide is but another way of saying petitioners were guilty of fraud. This is a charge not lightly to be made.

It appears that the petitioners were not the only stockholders of the Cleveland Company and that the sale of the Standard Company stock to them was without relation to the amount of stock held by each in the Cleveland Company and without relation to the proportionate holdings of all the stockholders of that company. There is no indication in the record of an intent to distribute to the petitioners, as stockholders, any of the profits or surplus of the corporation. Nor is there any direct evidence that the transaction between the petitioners and the Cleveland Company was not a valid purchase and sale.

Ordinarily, the purchaser of property derives no taxable income from the purchase, and the Board has held that " no gain or loss results from buying an article at less than its value until it is realized by sale or other disposition." *Morgan J. McMichael*, 4 B. T. A. 266, 269. See also *Trust Company of Georgia* v. *Rose*, 25 Fed. (2d) 997.

The theory apparently underlying Treasury Decision 3435 is that every sale of property by a corporation to a stockholder, or by an employer to an employee, for a sum substantially less than the fair market value of such property is presumptively calculated to evade payment of taxes. Instances may readily be conceived where a corporation or an employer might use such a device for the purpose assumed in the Department ruling, but it can not fairly be said that every such transaction is, in fact, a distribution of profits or compensation for services. Due regard must be given in each particular case to all the facts and circumstances surrounding the transaction involved. The ruling as stated is too broad. If it appears in any particular case that the transaction is in fact a distribution of corporate profits or compensation for services, then the ruling may well be applied and the transaction held to result in the receipt of income by the purchasing stockholder or employee.

Where the facts do not support such a conclusion, the ruling is unwarranted. In this case, in my opinion, the facts do not sustain the respondent's position.