E. K. WOOD LUMBER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23605, 24156.   Promulgated March 28, 1932.

1014

*Joseph Nievinski, Esq., H. W. B. Taylor, Esq.,* and *C. S. Cowan, C. P. A.,* for the petitioner.

*J. E. Marshall, Esq.,* for the respondent.

1016

1018

OPINION.

McMahon: The petitioner has waived assignments of error numbered 2 and 3 under Docket No. 24156. The determination of the respondent on those points will therefore not be disturbed.

With regard to assignment of error numbered 4 under Docket No. 24156, the parties have stipulated that the respondent erroneously included in the petitioner's income for 1918 the amount of $2,183, representing dividends, and the amount of $5,432.40, representing interest from United States obligations. In accordance with the stipulation, adjustment will be made under Rule 50.

The petitioner also waived assignments of error numbered 3, 4, 7 and 8 under Docket No. 23605. The respondent's determination on those points is therefore approved.

With regard to assignment of error numbered 6 under Docket No. 23605, it was stipulated between the parties that the respondent erroneously included in the petitioner's income for 1920 the amount of $1,847 representing dividends, and the amount of $267.37 represeting interest from United States obligations. Adjustment will be made accordingly under Rule 50.

With regard to assignment of error numbered 9 under Docket No. 23605, it was stipulated between the parties that the petitioner is entitled to a deduction in the amount of $3,392.32 representing petitioner's pro rata part of expenditures incurred in repairing the steamer *Tamalpais*. Adjustment will be made accordingly under Rule 50.

This leaves in controversy in Docket No. 24156 only assignment of error No. 1, which involves the Wilson Brothers & Company contract. There also remain for consideration under Docket No. 23605 assignment of error No. 1, involving the sale of timber to the Wynooche Timber Company and the sale to the Schafer Brothers Logging Company, assignment of error No. 2, involving the alleged sale of the Burrows Bay Mill site, and assignment of error No. 5, involving the inclusion in invested capital of 1920 of taxes overpaid for 1918.

The first question we will consider is whether the profit from the sale of the land and timber by petitioner to Wilson Bros. & Company (referred to as the partnership) is taxable in the year 1917 or 1918.

The petitioner and the partnership negotiated over a period of time for the sale to the partnership of land and timber owned by the petitioner. Finally on December 4, 1917, A. B. Johnson of the partnership and C. A. Thayer of the petitioner agreed orally upon the price and time of payment and transfer of property, and Thayer also agreed to permit the partnership to go upon the property for the purpose of beginning a survey for a railroad. It appears that a

line was surveyed to and over the property in section 34 and another line surveyed to, but not upon, the property in section 28. Although additional men were employed to construct the railroad, there is no testimony from which we can determine to what distance or extent the railroad along the two lines was under construction or had been completed. The deed was acknowledged and delivered and the purchase price paid on January 2, 1918.

The petitioner contends that the sale was complete on December 4, 1917, and that the parties intended that from that date the property should be the property of the partnership, whereas the respondent contends that the sale was completed in 1918. The question to be decided, therefore, is when the sale was consummated, in 1917 or 1918.

The statutes of the State of Washington require that all conveyances of real estate or of any interest therein, and all contracts creating or evidencing any encumbrances upon real estate shall be by deed and that all deeds and voluntary transfers of real estate or any interest therein shall be in writing, signed by the party bound thereby and acknowledged by the party making it before some person authorized by its laws to take acknowledgements of deeds. Sections 10550 and 10551, Remington's Compiled Statutes. These statutes are a part of the statute of frauds of Washington. *Pacheco* v. *Mello*, 247 Pac. (Wash.) 927; *McKay* v. *Calderwood*, 37 Wash. 194; 79 Pac. 629.

In the case of *Hendry* v. *Bird*, 132 Wash. 174; 237 Pac. 317; 240 Pac. 565, the court stated:

Our statute does not go to the question of the enforcement of a contract, but it affects the contract itself. * * *

It is stated in *Brown* v. *Kausche*, 98 Wash. 470; 167 Pac. 1075, that:

* * * An oral agreement to convey real property under the statute of frauds is void. *Somers Co.* v. *Pix*, 75 Wash. 233, 134 Pac. 932.

Previous to 1918 sufficient events had not occurred to satisfy the requirements of these statutes of Washington as construed by these decisions from that state.

As appears from our findings, negotiations for the sale of the timber lands in question were commenced by Wilson of the partnership and Kellogg of the petitioner and were continued by Johnson of the partnership and Thayer of the petitioner. On December 4, 1917, the latter orally agreed upon the purchase price of $136,000, which had been originally fixed at $180,000 by the petitioner. They then agreed, at the request of Johnson, that the partnership could enter upon the land for the purpose of making a survey for a railroad. This was followed by a discussion of the time of payment and it was agreed that it would be paid January 2, 1918.

At the request of Johnson, Thayer referred the matter by letter to Kellogg, who was to take up the matter further with Wilson of the partnership, who was to have the title examined and approve the form of deed.

It appears from the correspondence in evidence that the partnership expected to receive a warranty deed, whereas Thayer did not know what action the petitioner would take in this regard. (Petitioner's Exhibits 25 and 28 and respondent's Exhibits A, B, C, D and E.) This correspondence left the negotiations open. The petitioner did not definitely decide to execute a warranty deed until December 31, 1917, at which date the proper officers were authorized by the board of directors of petitioner to execute a warranty deed. This deed, though dated December 31, 1917, was acknowledged January 2, 1918. It was delivered January 2, 1918, to the partnership upon the payment of the full purchase price of $136,000 to the petitioner by the partnership; and the payment was credited on that date on the timber account in the books of account of petitioner, which were kept on an accrual basis.

In *American Land & Inv. Co.* v. *Commissioner*, 40 Fed. (2d) 336, the court stated:

* * * The courts have shown a strong tendency to take the view that "the sale" for revenue purposes takes place when the deed is executed and a substantial part of the purchase price is paid. This was the view taken by this court in *Stieff* v. *Tait* (D. C.) 26 F. (2d) 489, affirmed 31 F. (2d) 1920.

Likewise, the United States Supreme Court has taken the same view upon a case involving somewhat similar facts. See *Lucas* v. *North Texas Lumber Co.* 50 S. Ct. 184, 74 L. Ed. 668, filed Feb. 23, 1930. * * *

No part of the purchase price had been paid until January 2, 1918, upon delivery of the deed to the partnership.

It seems to us that the conclusion is unescapable that at most a mere executory contract existed, under which the parties agreed to close the transaction on January 2, 1918; that the petitioner did not relinquish its possession, but merely permitted the partnership after December 4, 1917, to enter upon the property for the purpose of beginning a survey for a proposed railroad and no more. Although extra men were employed to construct a railroad, there is no evidence that the construction of the railroad was commenced on the land in question prior to January 2, 1918.

In any event, in our opinion, for the purpose of income and profits taxes, the sale of the land and timber by petitioner to Wilson Bros. & Company was not complete and consummated until January 2, 1918, and the determination of the respondent in this regard is approved.

Since the respondent included the profit realized on this sale in income for 1918 instead of 1917, he refused to allow the inclusion

of such profit in invested capital for 1918. As we approve the determination of the respondent in including such profit in income for 1918 instead of 1917, we also approve the disallowance of such profit in invested capital for 1918. Current profits, or profits earned during taxable year, are not includable in invested capital for such year. Section 326 (a) (3), Revenue Act of 1918.

We will next consider the second assignment of error under Docket No. 23605, involving the sale of the Burrows Bay Mill site. A claimed loss upon the sale of this site was disallowed by the respondent as a deduction from petitioner's gross income for 1920, on the ground that the transaction was " deemed not to be a bona fide sale."

The facts in this transaction, in brief, are that Fred J. Wood in January, 1919, sold to the petitioner the so-called Burrows Bay Mill site for what it cost him and received Liberty bonds of the par value of $60,000 in payment therefor. A deed was executed by Wood and his wife and delivered to the petitioner. Wood testified that he thought this deed was a warranty deed, although he was not positive about that. This deed was held in the San Francisco office of the petitioner and was not recorded. The lumber business was in good condition at that time, but this condition thereafter changed for the worse. Therefore, the petitioner decided not to build a mill on the site and desired to sell the same. The directors of petitioner, at a directors' meeting held on December 27, 1920, voted to sell the site to Wood for $5,000, the resolution authorizing the sale stating that, inasmuch as the deed from Wood to the petitioner was never recorded, it be returned to Wood, it being unnecessary to prepare a new deed. The deed was returned to Wood, who kept it in his possession until about the forepart of February, 1923. Wood paid the taxes for 1920 and 1921. He treated the property as his own. In 1923 business conditions improved and the petitioner repurchased the site from Fred J. Wood for $5,000, plus $4,100.36 which was expended by Wood on the property between 1920 and 1923. Wood turned over the unrecorded deed to his attorneys for the purpose of preparing a quitclaim deed to reconvey the site to the petitioner. Neither Wood nor his attorneys know what became of the deed of 1919, and although search was made it was not found. Immediately after the transfer the petitioner began the construction of a mill on the site at a cost of approximately $1,000,000.

Fred J. Wood and his relatives owned between 85 and 90 per cent of the stock of the petitioner during the years 1919 and 1920.

There is no evidence whatever in this proceeding that the sale was made to take a loss for income-tax purposes. In *Budd* v. *Commissioner*, 43 Fed. (2d) 509, the Board specifically found that the trans-

fer of stock resulting in a loss of $90,000 was made with the purpose on the part of Budd of realizing a loss for the purpose of income taxes. Nevertheless, the court stated:

* * * There must be something more than mere suspicion that a perfectly legitimate transaction by men of high and unquestionable integrity was made for the sole purpose of committing a fraud by reducing taxes on account of a loss suffered in the depreciation of stock. "If the device is carried out by means of legal forms it is subject to no legal censure." *United States* v. *Isham*, 84 U. S. (17 Wall.) 496, 21 L. Ed. 728.

U. G. Richards, who was not related to F. J. Wood by blood or marriage and who is not now connected with the petitioner, but who was in the employ of the petitioner from 1909 until 1922 and served as manager, director and vice president, testified, in answer to the question whether anything was said with reference to creating a loss by the sale of the site to Wood for $5,000 so as to reduce the amount of taxes, that there was no discussion of that kind; that everything was done unanimously, without pressure; and that his vote and representations, and that of the minority stockholders were just as good as those of another, and that he never saw them deviate from that policy.

F. J. Wood testified that there was no discussion of the sale being made in order to take a loss for income-tax purposes and that there was no agreement, express or implied, that he would hold the property for the petitioner or that he was under any obligation to resell it to the petitioner.

From the evidence it seems to us that the purchase was actuated by an intention to build a mill on the site. When this became impracticable because of business conditions, the property was sold back to Wood. When conditions changed for the better the property was repurchased and the construction of a mill was immediately commenced.

The respondent contends that transactions between a corporation and its stockholders are subject to special scrutiny, citing *Frank E. Taplin et al.*, 12 B. T. A. 1264, in which case a corporation sold to its majority stockholders certain stock at less than one-fourth of its market value, and the Board held that the transaction was not bona fide. The Circuit Court of Appeals for the Sixth Circuit reversed the Board in that proceeding, and in its opinion, *Taplin* v. *Commissioner*, 41 Fed. (2d) 454, stated:

* * * The transfers to petitioners were in accordance with the arrangement between themselves. The transaction was never authorized or approved by any corporate action. The adverse corporate interest was not represented. Such a deal is subject to severe scrutiny. [Citing cases.] But it was valid until avoided, * * *

In this proceeding, the transfer of the property to Wood was authorized by corporate action.

We do not believe that a difference in cost and sale price resulting in a substantial loss standing alone, without other clear and convincing evidence, determines *ipso facto* a lack of *bona fides*. See *Budd* v. *Commissioner, supra; Taplin* v. *Commissioner, supra; David Stewart*, 17 B. T. A. 604; *P. P. Griffin*, 7 B. T. A. 1094.

All the witnesses for the petitioner testified frankly and to their best recollection with reference to this transaction. The respondent introduced no evidence. Subjecting all the evidence to special and severe scrutiny, we are of the opinion that the sale by the petitioner of this site to Wood was bona fide and that, therefore, the petitioner is entitled to deduct in 1920 any loss sustained upon this transaction.

Although the statute of frauds of the State of Washington, heretofore referred to, does not merely affect the remedy, but affects the obligation of the contract within such statute, yet, in our opinion, this transaction is taken out of such statute, since everything was done by the parties to the transaction to transfer possession, title and control except the execution and delivery of a new deed, the petitioner retaining at most the mere naked legal title. The statute operates on the agreement only while it is executory. 27 C. J. 312–313. See *McKay* v. *Meyer*, 103 Wash. 270; 174 Pac. 13; *Hughes* v. *Eastern R., etc., Co.*, 93 Wash. 558; 161 Pac. 343; *Gaisell* v. *Johnston*, 68 Wash. 470; 123 Pac. 783; *Horr* v. *Hollis*, 20 Wash. 424; 55 Pac. 565.

This transaction is clearly distinguishable from the Wilson Brothers & Company transaction in that this transaction constituted an executed contract, while the transaction with Wilson Brothers & Company at most constituted merely an executory contract. In this transaction the parties by performance had put it without their power to avoid the contract or evade its obligations, while, in the former, nothing was done except in a preliminary way to arrange for the closing and consummation of the transaction.

Since the property sold cost the petitioner $60,000 par value of Liberty bonds, $30,000 of the third issue and $30,000 of the fourth issue, which issues had a fair market value at the time of the transfer of $95²¹⁄₃₂ and $94⁴¹⁄₆₄, respectively, and was sold to Wood for $5,000, the loss upon the transaction is the difference between these amounts reduced by the amount of depreciation sustained during the time the property was owned by the petitioner.

While the second deed executed by Wood and his wife to the petitioner in 1923 did not contain the description of the personal prop-

erty on the premises and although the evidence is not absolutely clear as to whether or not the unrecorded deed contained a description thereof, it is apparent from all the evidence that the personal property and real estate were purchased and sold together and that the consideration covered both. Such personal property, having cost F. J. Wood $3,251 and having a value in January, 1919, of $1,500, is listed in our findings of fact. From the evidence we can not determine the depreciation sustained upon this personal property during the time it was owned by the petitioner. We must, therefore, hold that in computing the loss upon the transaction the basis must be reduced by the full value of the personal property, or $1,500. The basis must be further reduced by the depreciation sustained upon the barn and two silos located thereon, which cost $4,000 in June, 1918, and had a useful life of 20 years. We have no evidence as to the depreciation sustained upon the small frame building and the old hotel building. We must, therefore, hold that the full value of these two buildings, $25 and $200, respectively, should be deducted from the basis in determining the loss sustained.

Assignment of error No. 1 under Docket No. 23605 involves the sale of land and timber to the Wynooche Timber Company and the sale of timber to the Schafer Bros. Logging Company. The petitioner contends that since, under the law of Washington as interpreted by its courts, upon a conditional sale in which there is a forfeiture provision the vendor retains the absolute legal title and no right, title or interest passes to the vendee, no taxable profit arose until the petitioner had recovered its capital investment in the property.

Although the Schafer Bros. Logging Company contract is for the sale of standing timber, and not land and timber as is the Wynooche Timber Company contract, this is immaterial, in the consideration of these two contracts together, as a sale of standing timber under the law of the State of Washington is a sale of an interest in land and "partakes of the realty." *Beckman* v. *Brickely*, 258 Pac. (Wash.) 488; *France* v. *Deep River Logging Co.*, 79 Wash. 336; 140 Pac. 361.

These contracts, being for the sale of realty or an interest in realty situated in the State of Washington, are to be construed and interpreted according to the laws of that state. It is well recognized that rules governing descent, transfer, sale of property, and the rules which in any other way affect the title and the possession thereof are binding upon Federal courts. *Kuhn* v. *Fairmont Coal Co.*, 215 U. S. 349; *Burgess* v. *Seligman*, 107 U. S. 20; 25 C. J. 839-84 and cases cited; *Ferguson* v. *Commissioner*, 45 Fed. (2d) 573; *Poe* v. *Seaborn*, 282 U. S. 101.

The decisions of the courts of the State of Washington with respect to contracts such as are involved in this proceeding, i. e., executory contracts for the sale of land or interest in land containing a forfeiture clause, or its equivalent, are clearly stated and unambiguous. A leading case is that of *Schaefer* v. *Gregory Co.*, 112 Wash. 408; 192 Pac. 968. The court in its opinion states:

We come to the conclusion, therefore, that under the well-settled law of this state, the vendee in a forfeitable, executory contract of sale, has no legal or equitable interest in the property, the subject matter of the contract, and, although the contract may be of record, he is not one of the parties necessary to the condemnation proceedings.

Another leading case, which follows the *Schaefer* case, *supra*, is *Ashford* v. *Reese*, 132 Wash. 649; 233 Pac. 29. The Washington Supreme Court states as follows:

\* \* \* In such jurisdictions it had been held that the executory contract of sale created some title or interest in the vendee, either legal or equitable, and that the loss must follow the title or interest; whereas we have consistently held in numerous cases that an executory contract of sale in this state conveys no title or interest, either legal or equitable, to the vendee, and the loss following the title, it must be borne by the vendor. \* \* \*

See *Peck* v. *Farmers National Bank*, 137 Wash. 627; 243 Pac. 861; *Surry* v. *Baker*, 132 Wash. 188; 231 Pac. 791; *Bank of California* v. *Clear Lake Lumber Co.*, 146 Wash. 543; 264 Pac. 705; and *Florence A. Foster*, 18 B. T. A. 819.

As in *Florence A. Foster*, *supra*, so in this proceeding, under the laws of the state in which the property is situated and the intention of the parties as expressed in the contracts themselves, such contracts are executory contracts for sale and not present sales or closed transactions.

In brief, then, under these contracts the petitioner retained control of the property, the vendees having a mere license thereunder to enter thereon to cut the timber. *Bank of California* v. *Clear Lake Lumber Co.*, *supra*. The petitioner retained equitable title as well as legal title. If the timber were destroyed without fault of either party, the loss would fall upon the petitioner and the vendees could recover the purchase money paid on the ground of failure of consideration. All the burdens of ownership were retained by the vendor. *Ashford* v. *Reese*, *supra*.

By the express terms of the contracts and/or the interpretation of and construction placed upon such contracts by the courts of the State of Washington, no title passed to the vendees and would not pass until the purchase price in full had been paid as provided in the contracts. No deed or other conveyance was executed and by the terms of the contract the vendor was not required to execute and

deliver a deed or other conveyance until the purchase price had been paid in full in accordance with the terms of the contract. In the event the contract should be rescinded by the vendor upon default in payment of any of the deferred payments, it is obvious that the vendor could not recover the balance due on the notes and it is so stated in the Wynooche contract.

The payment of a part of the purchase price does not take such contract out of the category of executory contracts. See *R. J. Darnell, Inc.*, 18 B. T. A. 125; *Biscayne Bay Island Co.*, 23 B. T. A. 731.

At the hearing counsel for petitioner stated that he was unable to procure the original notes, and the originals of the notes as executed and delivered were not offered in evidence. In the photostatic copy of the minutes of the meeting of the petitioner's board of directors of July 12, 1920, there is a copy of a form of promissory note, marked "sample note," which contains the following:

This note is given as an evidence of indebtedness for the unpaid balance due on a land purchase contract dated————————between the E. K. Wood Lumber Company and the Wynooche Timber Company and is subject to all the terms and conditions as regards payment expressed within said contract.

Upon objection being made by counsel for the respondent to the admissibility of this form of "sample note," counsel for the petitioner and the respondent stipulated that, for the purposes of this case only, the notes may be considered as not having this condition upon them.

It is elementary that when separate writings are executed between the same parties at the same time, in the course and as parts of the same transaction, they are to be construed as one and the same instrument, and a note and contract, being contemporaneous instruments relating to the same subject matter, should be construed together to determine the liability of the maker of the note. *Davis v. Brown*, 94 U. S. 423; 24 L. Ed. 204; *Nichols v. Lane*, 192 N. Y. S. 362; *People's Bank of Ara v. Rankin*, 282 S. W. (Mo.) 91; *Farmers Equity Coop. Ass'n of Dresden v. Tice*, 122 Kan. 127; 251 Pac. 421; *Williams v. Kessler*, 295 S. W. (Mo. App.) 482; *Seaman v. McNaman*, 180 Wis. 609; 193 N. W. 377.

Both contracts provide that the notes are to be given merely in evidence of the deferred payments. The Wynooche contract provides that the notes are to be payable to the order of the petitioner at its office in Hoquiam, Washington, while the Schafer contract provides that the notes are to be payable to the petitioner. If the latter notes were drafted in accordance with the terms of the contract, and there is no evidence that they were not, they would have been nonnegotiable notes because not payable "to the order of"

or to "bearer." Two of the ten Wynooche Timber Company notes and one of the five notes of the Schafer Bros. Logging Company were paid in 1920 and all the remaining notes were paid in 1921 and 1922, as shown in our findings of fact. There is no evidence that the notes or any of them under either contract were ever negotiated.

Since the contracts are executory contracts merely and the transactions were not present completed sales, it is obvious that it is immaterial whether the notes were negotiable or not.

It is not necessary, therefore, for us to determine the realizable market value of those notes in 1920. Were the transactions under these contracts completed sales or closed transactions, it would be necessary so to do, but not in view of our holding. In *Bedell* v. *Commissioner*, 30 Fed. (2d) 622, the court stated:

\* \* \* Of course, it is true that an obligation, even a conditional obligation, is in some sense property, and, like anything else that can be transferred, may be said to have a value, but nevertheless payment is made in exchange for title, and will never be made if it is not conveyed. To speak of the profit as resulting because its amount can be presently ascertained, though performance remains uncertain, seems to us a perversion of language.

Under the laws of the State of Washington the vendor may not realize the profits anticipated under such a contract. Although the petitioner received payments on the contracts it does not necessarily follow that such receipts are income or profit for income-tax purposes. See *Burnet* v. *Logan*, 283 U. S. 404.

We therefore hold that the respondent erred in holding that petitioner derived in 1920 any taxable income from either the Wynooche Timber Company contract or the Schafer Bros. Logging Company contract.

With respect to error No. 5 under Docket No. 23605, since recomputation of the 1918 tax will result in a deficiency, though less in amount than heretofore determined by the respondent, and as the petitioner has only paid the tax as originally assessed for that year, we approve the action of the respondent assigned therein as error.

Reviewed by the Board.

Judgment will be entered under Rule 50.

SMITH concurs in the result.

STERNHAGEN dissents.

---

TRAMMELL, dissenting: I am unable to agree with the reasoning which sustains the loss on the Burrows Bay Mill site. While a corporation may legitimately distribute or sell any asset to its stockholders, I do not believe that it can take a loss on account of selling an asset to a stockholder in control of the corporation, unless it

sells it at a fair market value. Otherwise, a corporation might sell an asset to its stockholders for $10,000 which cost it $100,000, although it had a market value even in excess of cost, and take a loss. The record in my opinion is not sufficient to show that the market value was considered in the sale to Woods. If this principle is not followed there is nothing to prevent a corporation whose stock is closely held from taking mere arbitrary losses at will. The real question is where the burden of proof lies. My view is that the burden is on the taxpayer to show that it is entitled to the deduction and that this burden did not shift to the respondent when evidence of the sale was introduced. The testimony in the record is not sufficient.