Donald Borrelli and Mary Borrelli v. Commissioner.
Borrelli v. Commissioner
Docket No. 7269-70.
United States Tax Court
T.C. Memo 1972-178; 1972 Tax Ct. Memo LEXIS 79; 31 T.C.M. (CCH) 876; T.C.M. (RIA) 72178; August 17, 1972, Filed. Tried in Chicago, Ill. *79 Contemporaneous agreements executed on November 2, 1959, by petitioners and corporation construed to be not a legal conveyance of the property involved, but rather an executory contract for a conveyance to be made upon performance of specified conditions. Held, the sale of the property involved was consummated on March 30, 1960, and profit therefrom derived is subject to long-term capital gain treatment under sec. 1222(3), I.R.C. 1954. Arthur N. Nasser, 10 S. LaSalle, Chicago, Ill., for the petitioners. Walter T. Thompson, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies and additions to tax in petitioners' income tax as follows: Additions to tax
Sec.
Sec.
Year
Deficiency
6651(a)
6653(a) [1]
1966
$ 15.26
1967
$ 38.41
$503.10
122.26
1968
10,122.95
506.15 877 The issue presented for our consideration is whether petitioners held the parcel of real estate involved for more than *81 six months and, on receipt of the 18 lots in 1968, realized long-term capital gain in that year in the amount of the fair market value of the lots within the meaning of section 1222(3) of the 1954 Code. Findings of Fact Some of the facts have been stipulated and are so found and incorporated herein by this reference. Petitioners Donald and Mary Borrelli are husband and wife. They were residents of Hickory Hills, Illinois, at the time their petition herein was filed. They filed a joint return for the taxable year 1968 with the district director, Chicago, Illinois. Donald Borrelli, hereinafter sometimes called petitioner, graduated from the University of Illinois in 1932 with a degree in pharmacy. From that time until 1961, he practiced pharmacy. He owned four drugstores, three of which were sold in 1955 and one of which was sold in 1956. From 1957 to 1961, he was employed part time as a pharmacist. During the taxable year 1966, the petitioners engaged in the business of operating a motel known as Castle Acres, located in Hickory Hills, Illinois. Petitioner has operated a motel since 1962 or 1963. Petitioner never engaged in the real estate business or the business of building *82 homes or buying and selling land or lots. On July 24, 1959, the petitioners purchased acreage consisting of approximately 33 acres of unimproved land located in Crestwood, Illinois, hereinafter referred to as the Crestwood property, from Trinity Christian College Association. All Electric Homes, Inc., hereinafter referred to as All Electric, was an Illinois corporation, the stock of which was owned by Reamer G. Loomis, who is a realtor and builder, and one Syverson. The president and secretary of All Electric was Loomis and the vice president and treasurer was Syverson. Both served as directors. The third director was Kay Challingsworth, who was secretary to Loomis. Loomis owned 50 percent of the outstanding capital stock of All Electric. Neither of the petitioners were shareholders or officers or directors of All Electric. In November of 1959 Loomis and his partner talked to petitioner about buying the Crestwood property from him. Loomis asked petitioner to give him an option to buy the property. On November 2, 1959, petitioners entered into an "Option Agreement" to sell the Crestwood property to Al Electric Homes, Inc., and on the same date, petitioners and All Electric *83 executed a real estate contract, designated as "Agreement," providing for the sale of the Crestwood property to All Electric. The November 2, 1959, agreements provide, in part, as follows: OPTION AGREEMENT In consideration of $500.00, the receipt of which is hereby acknowledged, Donald A. Borrelli and Mary Jane Borrelli, his wife, hereby grant a 180 day option to All Electric Homes, Inc., an Illinois corporation, to purchase * * * real estate consisting of approximately 33 acres of unimproved land * * * located in * * * Cook County * * * for a total consideration of $235,000 DB upon the following terms and conditions: 1. Donald A. Borrelli and Mary Jane Borrelli agree to convey said property free and clear of all liens and encumbrances from the exercise of this option within 30 days of receipt of notice of said exercise of option. 2. All Electric Homes, Inc. may exercise this option by mailing written notice to Donald A. Borrelli and Mary Jane Borrelli at 9817 South Tulley, Oak Lawn, Illinois, on or before 180 days from the date of this Option Agreement, the date of this agreement being the first day in the computation of said terms. 3. The parties hereto agree to execute *84 the attached real estate contract, identified, attached and incorporated as part of this Option Agreement upon the exercise of this opinion by All Electric Homes, Inc.
Signed and sealed this 2nd day of November, 1959. * * * This Agreement is attached to and made a part of Option Agreement dated November 2, 1959, by and between All Electric Homes, Inc., an Illinois corporation, and Donald A. Borrelli and Mary Jane Borrelli, his wife. AGREEMENT All Electric Homes, Inc., an Illinois corporation, hereby agrees to purchase at a price of Two Hundred Twenty-Five 878 Thousand and no/100 Dollars ($225,000.00), the following described real estate situated in the County of Cook and State of Illinois: * * * and Donald A. Borrelli and Mary Jane Borrelli, his wife, of Oak Lawn, Illinois agree to sell premises at said price subject to the following terms and conditions: 1. All Electric Homes, Inc. shall pay $5,000.00 as a down payment, the option consideration of $500.00 being applied as part of said payment, on the above property and Donald A. Borrelli and Mary Jane Borrelli, his wife, shall convey title to said property to All Electric Homes, Inc. upon receipt of said $5,000.00 *85 free and clear of all liens and encumbrances and subject only to General Real Estate Taxes for the year 1960 and subsequent years and covenants and restrictions of record. 2. All Electric Homes, Inc., shall subdivide and construct residences on the property herein and the balance of $220,000.00 shall be paid as follows: a. When units of 10 homes are completed and sold, All Electric Homes, Inc. shall pay 10% of the balance due and owing until the property has been completely improved and the total balance due and owing has been paid in full. b. The minimum payment due by the end of each year of this Agreement regardless of paragraph 2a. above, shall be a total of $25,000.00. c. All Electric Homes, Inc. shall deposit in escrow a deed of reconveyance to seller herein for land not paid for and as each unit is sold and paid for said deed shall be surrendered and a new deed placed in escrow for the balance of the land unpaid under this agreement. d. It is understood that Buyer shall convey title to purchasers as residences are sold but in no event shall Buyer convey title to purchasers where monies are due and owing under the terms of this Agreement. e. In the event of default *86 in payment under the terms of this contract, the escrow agent shall be directed under the terms of the escrow and upon the showing of said default by the seller herein to cause the recording of said reconveyance deed. f. The parties hereto agree to deposit said deeds of reconveyance with * * * Escrow Agent and to sign written instructions to said Escrow Agent pursuant to the provisions of this Agreement. Signed and sealed this 2 day of November 1959. * * * Identified as part of Option Agreement dated November 2, 1959, by and between All Electric Homes, Inc. and Donald A. Borrelli and Mary Jane Borrelli, his wife. The option agreement and real estate contract ("Agreement") were drawn up by Loomis' attorney who represented All Electric in the transaction. Petitioners were not represented by an attorney. When the parties entered into the option agreement, the petitioners were not paid the full price of the property called for under the agreement. All Electric entered into the real estate contract at the same time it obtained the option agreement in order to "tie up" the property and to spell out the terms under which it was to be purchased. On March 30, 1960, petitioners *87 executed a deed and delivered their warranty deed conveying the Crestwood property to the First National Bank of Evergreen Park as trustee under the provisions of a trust agreement dated April 1, 1960 (known as Trust Number 152), for the benefit of All Electric. At the time the "Option Agreement" and "Agreement" were entered into and up to at least April 1, 1960, petitioners did not relinquish legal title or possession of the Crestwod property to All Electric. After April of 1960, the property was platted and a subdivision was approved by the Village of Crestwood. The property was subdivided into 153 lots. The total purchase price of $225,000 [2] called for under the real estate contract ("Agreement") was satisfied by payments made periodically as lots were sold by All Electric. In 1968, as final payment and in full satisfaction of the balance of the purchase price due petitioners on the sale of the Crestwood property, All Electric conveyed 18 improved lots to petitioners. Petitioners disposed of the 18 lots in 1968 and received $56,945.41 for their sale. In their joint *88 Federal income tax return for 1968, petitioners reported gain from the sale of these lots in the amount of $56,945.41 which they treated as capital gain from capital assets held for more than six months. 879 Respondent, in his statutory notice, determined that the fair market value of the 18 lots received from Loomis represented the last payment on the contract of sale of the Crestwood property, and since the land was held by petitioners at the time of sale for less than six months, the whole transaction was a short-term capital gain. Ultimate Finding of Fact Petitioners sold the Crestwood property on March 30, 1960, and their holding period for purposes of section 1222(3) ended on that date. Opinion The sole issue presented for our consideration is whether, on the date of its sale, petitioners had held the Crestwood property for more than six months. Respondent determined that petitioners realized short-term capital gain within the meaning of section 1222(1) of the 1954 Code [3] in the amount of the fair market value of the 18 lots which they received from All Electric Homes, Inc., in 1968. Essentially, it is respondent's position that on November 2, 1959, petitioner *89 and the corporation entered into an irrevocable contract for sale of the Crestwood property which passed equitable title to the purchaser; and that the sale was an unconditional and closed transaction for tax purposes on that date. Petitioners, in opposition, maintain that the sale of the property did not take place before March 30, 1960, at which time All Electric exercised the option granted under the November 2, 1959, option agreement and petitioners delivered and granted their legal title to the property to the First *90 National Bank of Evergreen Park as trustee for the purchaser. In the same vein, petitioners contend that since the 18 lots received by them from All Electric in 1968 represented final payment of the purchase price of the Crestwood property, the proceeds of $56,945.41 from the disposition of said lots by petitioners took on the same character as the original transaction and hence was subject to long-term capital gain treatment under section 1201 and section 1202 of the 1954 Code. As explained in McFeely v. Commissioner, 296 U.S. 102, 107 (1935), the word "held" as it appears in section 1222 has been equated with "owned." In common understanding, to hold property is to own it. In order to own or hold one must acquire. The date of acquisition is, then, that from which to compute the duration of ownership or the length of holding. * * * This principle applies to both the buyer and seller of the property involved in the transaction. The burden is on the taxpayer to show that he held the property in question for more than six months. See Fogel v. Commissioner, 203 F. 2d 347 *91 (C.A. 5, 1953), affirming a Memorandum Opinion of this Court; Joseph P. Pike, 44 T.C. 787, 797 (1965). James S. Reily, 53 T.C. 8, 13 (1969). We recognize there are no hard-and-fast rules of thumb that can be used in determining, for taxation purposes, when a sale was consummated, and no single factor is controlling. Ownership of property is not a single indivisible concept but an aggregate or bundle of rights with respect to the asset involved. Ted F. Merrill, 40 T.C. 66, 74 (1963), affd. per curiam 336 F. 2d 771 (C.A. 9, 1964); consequently, we must examine the transaction in its entirety and in light of realism and practicality. Clodfelter v. Commissioner, 426 F. 2d 1391, 1393 (C.A. 9, 1970), affirming 48 T.C. 694 (1967). The date of passage of legal title is a significant factor and transfer of possession is also material. Brunton v. Commissioner, 42 F. 2d 81 (C.A. 9, 1930), affirming 15 B.T.A. 348 (1929). A contract to sell realty normally does not terminate the seller's *92 holding period; of itself it does not mark a closed transaction. The technical refinements of legal title alone do not determine when a taxpayer's holding period with respect to real property begins and ends for purposes of section 1221, supra. Helvering v. Gambrill, 313 U.S. 11 (1941); Moore v. Commissioner, 124 F. 2d 991 (C.A. 7, 1941), affirming in part and reversing in part 880 42 B.T.A. 949 (1940). The date on which the benefits and burdens or the incidents of ownership of the property are transferred to the buyer marks the completed sale. Lucas v. North Texas Co., 281 U.S. 11 (1930); Samuel C. Chapin, 12 T.C. 235 (1949), affd. 180 F. 2d 140 (C.A. 8, 1950); Commissioner v. Segall, 114 F. 2d 706, 709-710 (C.A. 6, 1940), certiorari denied 313 U.S. 562 (1941); Commissioner v. Union Pac. R. Co., 86 F. 2d 637 (C.A. 2, 1936), affirming 32 B.T.A. 383, 391 (1935). See also Morco Corp. v. Commissioner, 300 F. 2d 245 (C.A. 2, 1962), affirming a Memorandum Opinion of this Court. See Rev. Rul. 54-607, 1954-2 C.B. 117. *93 Since the property involved herein is situated in Illinois, the law of that state is authoritative in construing the pertinent instrument which fixes the time when petitioners sold the property in question to All Electric. Poe v. Seaborn, 282 U.S. 101 (1930); Vernon Hoven, 56 T.C. 50, 55 (1971); Helen E. Leatherbee, et al., Executors, 34 B.T.A. 196, 199 (1936). We find nothing in the Illinois law which requires the conclusion that the November 2 agreement passed legal title of the Crestwood property to All Electric. Admittedly, under Illinois law when the owner of land enters into a valid and enforceable contract for its sale, under the doctrine of equitable conversion, the buyer - in limited circumstances - becomes the equitable owner, but the vendor continues to hold the legal title in trust for the buyer. Rosewood Corporation v. Fisher, 46 Ill. 2d 249, 263 N.E. 2d 833, 838 (1970). In Shay v. Penrose, 25 Ill. 2d 477, 185 N.E. 2d 218, 219-220 (1962), relied on by respondent, the Court specifically limited application of *94 the doctrine to the particular issue therein, which is not germane in the instant case. The Illinois Supreme Court, considering the nature of an option and the consequences of its acceptance, stated in Northern Illinois Coal Corporation v. Cryder, 361 Ill. 274, 197 N.E. 750, 755 (1935): An option, so long as it remains unaccepted, is a unilateral writing lacking the mutual elements of a contract, but when accepted by the optionee there emerges, as the result of such acceptance, an executory contract inter partes, with the optionor as the vendor and the optionee as the vendee, for the sale and purchase of the optioned property, mutually binding upon the optionor and optionee and containing mutual rights and obligations enforceable as such in accordance with the established rules relating to executory contracts. * * * [Emphasis added:) The Court stated further that in determining when the option is accepted by the optionee, it is necessary to "ascertain the intent of the parties from the instrument in the light of the language employed and the surrounding facts and circumstances *95 attenaint upon the transaction." In the same vein, the Supreme Court of Illinois noted that: Another generally recognized principle in the interpretation of contracts is, that if the contract be regarded as ambiguous or uncertain, the practical construction of the contract, as shown by the acts of the parties thereto, is persuasive of the true construction to be accorded the contract. Nelson v. John B. Colegrove & Co. State Bank, 354 Ill. 408, 188 N.E. 461 * * * In the instant case the material facts are not in dispute and the crux of the problem presented is the effect of the contemporaneous agreements of the parties dated November 2, 1959. The real estate contract ("Agreement") states that petitioners would convey legal title to the property involved to All Electric upon receipt of a $5,000 downpayment from the corporation, the $500 paid for the option to be applied against the downpayment. Although the record does not indicate exactly when All Electric paid the remaining $4,500 of the downpayment, the evidence shows that on March 30, 1960, petitioners delivered their warranty deed conveying the property to the First National Bank of Evergreen Park as trustee for *96 the benefit of the corporation. After April 1, 1960, the purchaser took physical possession of the property, platted, and subdivided it into lots. For reasons hereinafter discussed, we think it quite apparent that the November 2 agreement did not constitute an unconditional sale of the property on that date for taxation purposes and that petitioners have met their burden of proving that they held the property in question for more than six months within the purview of section 1222(3), supra. As we interpret the contemporaneous documents of November 2, 1959, the agreement which was specifically mentioned as "Identified as part of Option 881 Agreement" was supplementary to the terms under which a sale of the property involved would be made in the event the option was exercised by All Electric and delineated the manner in which the balance of the consideration ($220,000) would be paid to petitioner as the houses were sold. Petitioner (who had not been represented by an attorney with respect to the transaction under review) testified that it was his understanding that he gave Reamer G. Loomis, president of All Electric, an option with "an agreement to buy it with a stipulation *97 as to how it would be paid off if he bought it." Corroborating his view, Loomis testified that the agreement, which probably could have been in one document, was intended to be only an option and "spelled out the terms" under which his corporation was "going to purchase the property." In further support of petitioner's position, Loomis testified that All Electric exercised the option in April of 1960, when he created a land trust at the First National Bank of Evergreen Park and petitioner deeded the property to the trust for the benefit of the purchaser. We believe that the construction given by both parties to the agreements, which might otherwise be doubtful, is entitled to considerable weight. Groome v. Freyn Engineering Co., 374 Ill. 113, 28 N.E. 2d 274 (1940); Northern Illinois Coal Corporation v. Cryder, supra.The fact that the so-called real estate contract provides that petitioners "agree to sell" and that All Electric "agrees to purchase," is not determinative of a completed sale on the date of the agreement. In our view the instruments in controversy *98 must be construed as a whole and greater regard given to the intention as reflected by the entire agreement, than to the separate meaning of any particular words or expression. W.L. and J.D. Griffith, Executors, 10 B.T.A. 799, 802 (1928); Heryford v. Davis, 102 U.S. 235, 243-244. Even if the November 2 agreements did not constitute an unaccepted option (including supplemental details relating to payment of the total consideration), we believe at best the agreements were purely executory in nature and preliminary to the completed sale on March 30 or April 1, 1960. The November 2 agreements did not effect a passage of title; nor did they unconditionally obligate petitioners to execute and deliver a deed of conveyance. It seems to us that at most a mere executory contract existed on November 2, 1959, under which the parties agreed to close the transaction when certain conditions were fulfilled by the optionee, and that petitioners did not relinquish their possession nor did the corporation assume the benefits and burdens of the property until April 1960. Whether *99 a contract of sale is executory or executed depends primarily on the intention of the parties, to be gathered from the terms of the contract and such surrounding circumstances as may be properly considered as evidencing the intention. Hatch v. Oil Co., 100 U.S. 124, 131 (1879); Beardsley v. Beardsley, 138 U.S. 262, 266 (1891). We believe the whole history of the agreement and the parties' subsequent actions under it show that the payment of the $4,500 was a condition precedent to completion of the sale, that is, the transfer of legal title to All Electric, and that such was the intention of the parties involved. Ownership by the corporation was not obtained by it until petitioners received the balance of the downpayment and the deed of conveyance was executed by petitioners and given to the trustee for the benefit of the corporation. At that time, i. e., March 30, 1960, the agreement to sell was converted into a completed sale. See Harry C. Moir, 14 B.T.A. 23, 32 (1928), affd. 45 F. 2d 356 (C.A. 7, 1950). Thereafter, in April 1960, All Electric assumed the incidents of ownership, i.e., subdividing, platting, improving the property, *100 making payments of the purchase price to petitioners, and realizing benefits flowing therefrom. Petitioners retained legal title and exclusive possession of the property until March 30 or April 1, 1960, when All Electric entered upon the property in order to plat and subdivide the land. See 2 Lexington Avenue Corp., 26 T.C. 816, 824 (1956); E. K. Wood Lumber Co., 25 B.T.A. 1013, 1024 (1932); Charles W. Dahlinger, 20 B.T.A. 176, 183 (1930); and Northern Illinois Coal Corporation v. Cryder, supra. We find no merit in respondent's contention that petitioners failed to prove that they received the downpayment of $4,500 or that they gave All Electric possession of the property. We are satisfied that All Electric paid the downpayment required by the agreement on or about March 30, 1960, and took physical possession of the property after April 1960. Respondent's argument is tantamount to a concession that the November 2, 1959, transaction conferred nothing to All Electric except the option, and that the transaction was not then closed for tax purposes. 882 Moreover, we are unable to ascertain exactly what rights of ownership *101 respondent contends were transferred to All Electric on November 2, 1959. Assuming, as respondent avers, that substantial contract rights accrued to the corporation prior to March 30, 1960, nevertheless, All Electric had no burdens or benefits of ownership which were the necessary ingredients to mark the end of petitioners' holding period before March 30, 1960. Respondent's reliance on Ted F. Merrill, supra, and Commissioner v. Union Pac. R. Co., supra, is misplaced. There the court dealt with a "closed transaction," that is, one in which, among other things, the seller's right to the purchase price was unconditional. We do not believe that these cases are applicable to a situation like the one before applicable to situation like the one before us in which the seller has no such unconditional right and payment of the downpayment was a condition precedent to the conveyance of title to the purchaser. Moreover, unlike these two cases, here it is clear that the purchaser did not assume any substantial incidents of ownership prior to March 30, 1960. In the light of the foregoing, we hold that petitioners have established by a preponderance of the evidence *102 that they held the Crestwood property for more than six months at the time of its sale. Accordingly, petitioners realized long-term capital gain in 1968 upon receipt of the 18 improved lots as final payment from All Electric in the amount of the fair market value thereof within the intendment of section 1222(3), supra. Decision will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all statutory statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. We find no explanation in the record for the amount of $235,000 set forth in the option agreement.↩
3. SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES. For purposes of this subtitle - (1) Short-term capital gain. - The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income. * * * (3) Long-term capital gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.↩