CHARLES W. DAHLINGER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33721.   Promulgated June 30, 1930.

*W. W. Booth, Esq.*, and *W. A. Seifert, Esq.*, for the petitioner.
*Bruce A. Low, Esq.*, for the respondent.

178

OPINION.

MURDOCK: The petitioner, having contributed $250 to the Pennsylvania League of Women Voters, claims the' right to deduct the amount under section 214 (a) (11) of the Revenue Act of 1921, which allows the deduction of contributions to corporations " organized and operated exclusively for religious, charitable, scientific, literary or education purposes, * * * no part of the net earnings of which inures to the benefit of any private stockholder or individual." We are convinced that during the year 1923, the Pennsylvania League of Women Voters was a corporation organized and operated exclusively for educational purposes and that no part of its net income inured to the benefit of any individual. The deduction of this contribution should be allowed subject to the 15 per cent limitation. *Unity School of Christianity*, 4 B. T. A. 61; *Rose D. Forbes*, 7 B. T. A. 209; *E. Sohier Welch et al., Trustees*, 9 B. T. A. 1370; *Armin A. Schlesinger*, 11 B. T. A. 601; *Roy Upham*, 16 B. T. A. 950.

The petitioner contends that the profit which he received in each of the years before us from the sale of the Columbia Plate Glass Co. stock is taxable under section 206 of the Revenue Act of 1921 cr section 208 of the Revenue Act of 1924. The provisions of these two sections, so far as pertinent hereto, are the same. The parties

are in agreement as to the amount of profit applicable to each year, and disagree only as to the method of taxing that profit. The petitioner claims that the profit for each year should be taxed as a capital gain at the 12½ per cent rate. The respondent claims that the annual gain should be taxed in the usual way with any other income. He concedes that the use of the installment sales method chosen by the petitioner to report his profit from this sale is proper. The question turns upon the proper interpretation of subparagraph (a) (1) of the above sections, which appeared for the first time in the Revenue Act of 1921, and is as follows:

The term "capital gain" means taxable gain from the sale or exchange of capital assets consummated after December 31, 1921.

The Congressional Committee reports relating to the Revenue Act of 1921 show that the provisions of section 206 were intended to be remedial or relief legislation, i. e., to permit sales of capital assets to be made without fear of prohibitive tax, which sales it was believed were being prevented by the high rates of tax. On September 2, 1921, Dr. T. S. Adams, Tax Adviser to the Treasury Department, was making a statement to the Finance Committee of the Senate in regard to the provision as it had come from the House. The record of that hearing contains the following:

Dr. ADAMS. This section 207 [later amended and made 206] was adopted by the House in the belief that a great many important transactions in the way of the sale of capital assets are now being held up or blocked by the heavy rates of taxation.  *  *  *

Sen. CURTIS. No man makes a sale of that kind unless he feels he is justified in paying the tax.

Dr. ADAMS. That is the point. Thousands of these sales are now being held up.

Sen. CURTIS. Your idea is to relieve that situation?

The report of the Finance Committee made by Senator Penrose under date of September 26, 1921, contained the following:

Section 206 limits the rate of taxation upon gain derived from the sale of capital assets. Under the present law many sales of farms, mineral properties, and other capital assets have been prevented by the fact that gains and profits earned over a series of years are under the present law taxed as a lump sum and the amount of the surtax excessively enhanced thereby. In order to permit such transactions to take place without fear of prohibitive tax, section 206 provides  *  *  *.

Most cases in which the word "consummate," in one form or another, is discussed, deal with the question of when a sale is consummated *to the extent* necessary to entitle a broker to his commission, to which question special rules of law apply. That question and the one now before us are quite different, and, therefore, these cases are not a safe guide or even a helpful authority in de-

termining the meaning of this word as used in the sections in question. The word "consummated," except perhaps as it applies to the question of brokers' commissions, does not have any legal meaning or significance distinguishable from its usual and ordinary meaning. Therefore, we resort to the definition of this word as given in standard dictionaries now in general use where the transitive verb "consummate" is defined as follows: "To bring to completion; to raise, bring or carry to the highest or utmost point or degree; to complete; to finish; to perfect; to achieve; to fulfill." The word "consummated," as used in the Act, is the past participle of the transitive verb above defined.

Having in mind the definition of the word "consummated," we must next consider the word "sale," for the real difficulty in this case is to determine when the sale was consummated within the meaning of the sections in question. This word "sale" has a well recognized legal significance.

The distinction between a contract to sell and a sale is fundamental in the law of sales, as is pointed out in Williston on Sales, 2d ed., vol. 1, ch. 1, where the following definitions are given:

A contract to sell goods is a contract whereby the seller agrees to transfer the property in goods to the buyer for a consideration called the price.

A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.

\* \* \* \* \* \* \*

The distinction is some times expressed by the terms "executory" and "executed" sales. Whether a bargain between parties is a contract to sell or an actual sale, depends upon whether the property in the goods is transferred. If it is transferred, there is a sale, an executed sale, even though the price be not paid.

Sales and contracts to sell may both be subject to conditions expressed or implied, and conditions may be conditions subsequent or conditions precedent. A condition precedent requires that something shall happen prior to the vesting of the property in the buyer. A condition subsequent divests by its happening a title which has already vested.

In the present case it is conceded by all that title to the stock passed before December 31, 1921. But the petitioner points out that on that date the purchase price had not been fully paid, the income-tax liability of the Columbia Plate Glass Co. had not been settled, the trustee had many duties to perform, and in order to complete the sale it was necessary to bring to completion these details of the sale in accordance with its terms. He argues that the sale was not brought to completion or carried to the utmost point until after December 31, 1921, and in the alternative, that it is at least doubtful whether the sale was not brought to completion or carried

to the utmost point after December 31, 1921, and therefore, judgment on this point should be in his favor because the provision, being remedial legislation, should be liberally interpreted to accomplish its intended purpose. Citing *G. M. Standifer Construction Corporation*, 4 B. T. A. 525. And, furthermore, he argues that if there is any doubt as to the meaning of the section, that doubt should be resolved in his favor. Citing *United States* v. *Wigglesworth*, 2 *Story* 368; *Gould* v. *Gould*, 245 U. S. 151; *United States* v. *Merriam*, 263 U. S. 179; *Bowers* v. *New York and Albany Lighterage Co.*, 273 U. S. 346; and *Russell* v. *United States*, 278 U. S. 181.

It is apparent, however, that the sale in question had taken place in the year 1920, had not been prevented and was not being held up by any fear of prohibitive tax, but, on the contrary, had progressed to a point beyond which there was no recall long before the Revenue Act of 1921 was approved, and long before the committee reports above referred to were made. The sellers did not wait for any tax relief, and, so far as we know, did not expect any. Clearly, the sale was not one of those to which Congress intended the relief to apply. Section 206 was a new plan of taxation which supplemented the old, and in order to make clear under what circumstances the new plan should apply, Congress chose a future date, December 31, 1921, and a significant event, namely, a consummated sale, so that the act would in nowise be retroactive and taxpayers contemplating sales would know in advance just what tax liability would result from a sale. This was a reasonable legislative plan which the Act fulfilled if fairly read.

Furthermore, a proper application of the statutory rule of liberal interpretation invoked by the petitioner does not require that the law of sales be disregarded or unduly stretched. Although a contract to sell is consummated when the parties execute it, a sale, even where the subject of a contract, is incomplete and imperfect until title passes. But a sale is complete when title passes. At that moment both parties to the sale achieve what they set out to accomplish by the sale. A seller who formerly had property which he desired to sell, thereafter had that property no longer. He thereupon exchanged his right and title to the property for the purchase price or the purchaser's promise to pay it. The property thereafter belonged to the purchaser and he had what he did not have before, an obligation to pay for it. The passing of title irrevocably and finally changes the rights of the parties to a sale. A sale is then " consummated."

But, the petitioner argues, on December 31, 1921, he had not received all of the purchase price, and he still had to settle the income-tax liability of the Columbia Plate Glass Co. Suppose he

never received these unpaid installments. Can he say, on that account, that his stock which had been delivered and almost half paid for, had not been completely sold? Would any one say that the stock was not sold and the sale a thing of the past? In this connection note that on December 4, 1919, $50,000 was deposited by the purchasers to be credited on the purchase price when the sale was "consummated." We do not know just when it was credited, but apparently it was credited on or before January 27, 1920. The payment of these installments and the settlement of the income-tax liability admittedly were not conditions to the passing of title to the stock under the arrangement for substituting bonds, nor could title be divested by a failure to make the payments or settle the tax liability: These provisions were covenants rather than conditions. *Dempwolf* v. *Graybill*, 213 Pa. 163; 62 Atl. 645; *Rooks Creek Evangelical Lutheran Church* v. *First Lutheran Church of Pontiac*, 290 Ill. 133; 124 N. E. 793; *Woodruff* v. *Woodruff et al.*, 44 N. J. E. 349; 16 Atl. 4. If the installments were not paid when due, the petitioner could enforce his rights to the purchase price given him by the sale, but he could not recall his title in the stock or replevin it. By the terms of the contract, he was required to look to the security deposited by the purchaser with the trust company, and he could not hold the purchaser personally liable or look directly to the stock. If the seller had failed to settle the income-tax liability, he would have subjected himself to a suit for damages, or, probably, in accordance with the agreement, the purchaser would have had the trustee delay payments of the purchase price sufficiently to protect the purchaser in this connection.

It therefore appears to us that in limiting the application of the special rate of tax on capital gains to the gain on sales consummated after December 31, 1921, Congress did not intend that it should apply in every case where taxable income from a sale was received after December 31, 1921, but, on the contrary, intended that it should apply only in the case of income received after December 31, 1921, from sales which on that date had not reached that final state which results from the passing of title to the property sold: *J. W. McWilliams*, 15 B. T. A. 329. Cf. *Webb Press Co., Ltd.*, 3 B. T. A. 247; *W. L. Griffith et al., Executors*, 10 B. T. A. 799; *Henry P. Werner*, 15 B. T. A. 482; *North Texas Lumber Co.*, 7 B. T. A. 1193, *Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11. On this point our judgment is for the respondent.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

MARQUETTE dissents.

ARUNDELL, dissenting: In my opinion the activities of the League of Women Votes, to which petitioner contributed, in advocating such municipal or legislative measures as voting machines, better election laws and bond issues, bring that organization within the decision in *Joseph M. Price*, 12 B. T. A. 1186, in which we held that the civic fund of the City Club of New York was not organized and operated exclusively for educational purposes within the meaning of the statute. In the *Price* case we said in part:

Even if it be conceded that there is some element of education in the dissemination of information through the club's publications, its advocacy of or opposition to candidates and proposed municipal measures carries it beyond the exclusively educational purposes contemplated by the taxing statute.

LANSDON, SMITH, and McMAHON agree with this dissent.

———

SEAWELL, dissenting: I am not persuaded that the correct interpretation has been placed on subparagraph (a) (1) of section 208 of the Revenue Act under discussion. The decision is based upon the definition of one word in the section, the word " consummated "; and the section is discussed as if this word were removed and the italicized words which I here supply in its stead were placed in the section, and the section written as follows: " The term ' capital gain ' means taxable gain from sale or exchange of capital assets " *derived from contracts executed* " after December 31, 1921." The words " consummated " and " executed " are not synonymous. " Consummated " is a more inclusive word, and itself has a wider and a more significant meaning in a taxing statute than it has in a brokerage contract or in ordinary and usual speech. For instance, in an old but important tax case in the Court of Claims it was said: "An act is not consummated where anything in relation to it remains to be done "; and it was there held that although handing money to an officer of the United States Government would ordinarily consummate payment to the Government, yet in the light of the statute then under discussion, it was held necessary to do more, i. e., to cover the payment into the treasury by a " covering-in warrant " before the payment was " consummated." By this unusual enlargement of the meaning of the word " payment " effect was given to the statute enacted for the protection of depositors in national banks. (*Johnston v. United States*, 17 Ct. Cls. 173.)

A " consummated " sale or exchange of capital assets under the statute, in this case, must include the payment of the sale price or receipt of the property taken in exchange if there is to be " taxable gain "—in reference to which the law was enacted and without which there was no purpose in its enactment. A contract without payment

of the consideration might be consummated to the extent necessary to support an action for damages for its breach; or to support an action for specific performance if it related to the sale of land; but we are not dealing with a tax on contracts, but rather with "taxable gain" growing out of contracts under a taxing statute which must be construed liberally in favor of the taxpayer, and in the construction of which it is most necessary first to consider the context. Mr. Justice Story said: "The legislature must be presumed to use words in their known and ordinary signification, unless that sense is repelled by the context." (*Levy* v. *McCartee*, 6 Pet. 110.) In remedial statutes, such as we have under consideration, it is said to be proper to extend the construction of words beyond their natural import and effect in order to afford the relief indicated in the context. (*Beley* v. *Naphtaly*, 73 Fed. 125; *Logan* v. *Davis*, 233 U. S. 613.) Professor Williston's definition of a contract, given in the opinion, has reference to ordinary commercial sales, an entirely different proposition from that here involved. It does not appear necessary, however, to place any very strained construction or definition on the words of this statute, if we will keep in mind the fact that this is a taxing statute, having reference to the Sixteenth Amendment and intended to relieve a former burdensome provision of the law. No tax liability can attach to a mere contract of sale or of exchange, executory or executed, but only to the taxable gain received by the contracting party under the contract. Incomes are taxable only in the year in which they come in. "Taxable gain" is not consummated whether it grows out of a sale or of an exchange of capital assets under a contract made before or after December 31, 1921, until it is received by the seller or bargainer. A sale or exchange is not "complete, finished, raised or carried to the highest or utmost point or degree,"—consummated, for tax purposes, until the consideration is paid.

Further, the construction of the statute as made in the Board's opinion and decision, it occurs to me, might lend itself to inequalities of taxation which Congress did not intend. By way of illustration: A and B are each the owner of $100,000 par value of stock in the same corporation, for which they respectively paid at the same time, at a date since March 1, 1913, the sum of $50,000. On December 31, 1921, A sells his stock to C for $100,000, payable $50,000 on July 1, 1922, and $50,000 on July 1, 1923, and delivers the stock to C; and on January 1, 1922, B sells his stock to C for $100,000, payable $50,000 on July 1, 1922, and $50,000 on July 1, 1923, and delivers his stock to C. A and B are each paid by C at the time and in the amounts contracted; and by the several transactions A and B each receive a taxable gain of $25,000 on July 1, 1922, and $25,000 on July

1, 1923. Did Congress, under the given circumstances, intend to tax A at one rate and B at another rate upon their respective incomes, identical in amount, received at the same time from the same person for like consideration? This would seem a *consummation* devoutly not to be wished.