SAMUEL L. HOFFMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 44833.    Promulgated August 29, 1933.

*Harold Wisan, Esq.*, for the petitioner.
*R. W. Wilson, Esq.*, for the respondent.

OPINION.

TRAMMELL: This proceeding is for the redetermination of a deficiency in income tax of $1,671.18 for 1926. The only question pre-

sented by the petition as amended is whether in the determination of the petitioner's tax liability an amount of $45,233.75 alleged to represent losses sustained on the sale of certain corporate stock and machinery held for more than two years is to be allowed as a deduction against ordinary income under the provisions of section 214 (a) (4) or (5) of the Revenue Act of 1926, or is to be treated as a " capital net loss " within the meaning of the provisions of section 208 (a) (6) and (c) of the act, as was done by the respondent. In an amended answer the respondent alleged that he erred in determining that the sale of the above mentioned stock occurred in 1926 and that a loss thereon was sustained in that year. He moved for an increase of the deficiency accordingly.

In 1923 the petitioner acquired 750 shares or one half of the capital stock of the Dorman Commission Co. at a cost of $75,000. The other half of the stock was owned by Thomas B. Dorman and members of his family. The business of Dorman Commission Co., hereinafter referred to as the Commission Co., was that of selling merchandise, principally blankets, on a commission basis.

Some time prior to April 1926, the Phillips Blanket Mills, a corporation engaged in the manufacture of blankets at Parsons, West Virginia, became indebted to the Commission Co., the latter holding four notes of the former secured by a mortgage on a mill belonging to the former. The mortgage stood in the name of Thomas B. Dorman, trustee, in which capacity he was acting for the Commission Co. The mortgage was foreclosed and the mill was sold at foreclosure on April 30, 1926, at which time Dorman, acting as trustee for the Commission Co., bid it in. The sale was confirmed on July 5, 1926, and title to the mill passed to Dorman as trustee for the Commission Co.

In 1925 the Commission Co. was carrying on business at a loss and in the latter part of the year the petitioner approached Dorman with respect to dissolving the company at the end of 1925 and distributing its assets. They subsequently had several conferences with respect to Dorman purchasing the petitioner's stock in the company. Dorman finally suggested that the petitioner continue as a stockholder until July 1, 1926. The petitioner acquiesced in this suggestion. During this period the company continued to operate at a loss. About April 1926, when the foreclosure proceedings referred to above were taking place, it was agreed that Dorman would buy the petitioner's stock in the Commission Co.

On July 9, 1926, the petitioner and Dorman held a conference in the office of the petitioner's attorney, Jacob Schapiro, who held a power of attorney from the petitioner and had performed various legal services for him. Schapiro kept many of the petitioner's

papers and securities in his safe and also had access to the petitioner's vault.

The sale of the petitioner's stock to Dorman was discussed further at this conference and it was verbally agreed that the petitioner would receive for his stock a one-half interest in the mill acquired by the Commission Co. under the foreclosure proceedings mentioned above and which was standing in the name of Dorman as trustee. This transaction was to be effective as of July 1, 1926. On that date and throughout the remainder of the year one half the value of the mill was $29,866.25. Also the petitioner was to receive $1,600 from Dorman " to replace some losses that had occurred on some items " relating to the activities of the Commission Co. Within a day or two after July 9, 1926, Dorman delivered to the petitioner a note in the amount of $1,600, bearing interest from July 1, 1926.

On July 9, 1926, the certificates for the petitioner's 750 shares of stock in the Commission Co. were in the possession of Schapiro, his attorney, where they had been for some time. At the conference on that date the petitioner endorsed the certificates in blank and gave them back to Schapiro to be held by him pending the compliance by Dorman with " certain formalities " upon the completion of which they were to be delivered to Dorman. The " formalities " with which Dorman was to comply were: (1) Reduce the capital stock of the Commission Co., distribute the mill as an asset of the company and formally transfer a one-half interest in it to the petitioner; or (2) have the mill sold and pay the petitioner one half of the proceeds received therefrom; or (3) form a new corporation, and have the Commission Co. transfer the mill to it for stock, then have the Commission Co.'s capitalization reduced and a portion of the stock so received by the Commission Co. transferred to the petitioner, the amount to be transferred to be based on the asset value of the mill in the new corporation. On July 9, 1926, Dorman had not decided which of the foregoing steps he would take. However, about that date he and the petitioner discussed the formation of " some sort of a new organization " as soon as the mill could be rehabilitated or placed in an operating status. Thereafter the petitioner and Dorman, working together, sought to sell the mill until about November 1926, when one Ackerly sought to acquire an interest in it. Ackerly was a mill man and had his own mills. He had been operating the mill here involved since its acquisition by the Commission Co. at the foreclosure sale. He had put some new machinery in the mill and with the aid of the petitioner and Dorman had taken upon himself the work of rehabilitating it. It was agreed that a new corporation would be formed which would take over the mill and that Dorman would receive one third of the stock, the

petitioner one third, and Ackerly and the interests associated with him, who were to contribute machinery and cash in the total amount of approximately $30,000, would receive one third. At some undisclosed date in 1926 or 1927, but on or before February 14, 1927, the new corporation, known as "Dorman Mills, Incorporated", and hereinafter referred to as the Dorman Mills, was organized.

On or about February 14, 1927, the Commission Co. exchanged the mill it had acquired at the foreclosure sale for shares of stock in the Dorman Mills. The Commission Co. distributed these shares to its stockholders and accordingly reduced its own capital stock to $600. The one third of the stock in the Dorman Mills that the petitioner was to receive was delivered to him in the early part of 1927.

The certificates for the 750 shares of stock in the Commission Co. which the petitioner endorsed in blank on July 9, 1926, and gave to Schapiro to be held by him pending the compliance with "certain formalities" by Dorman and upon the completion of which they were to be delivered to Dorman, were not delivered by Schapiro until some time after 1927, when they were turned in for final cancellation.

After July 1, 1926, the petitioner took no interest in and had nothing to do with the operation or control of the Commission Co.

In 1923 the petitioner purchased certain machinery at a cost of $11,077 and in 1926 sold it for $5,500. Depreciation sustained on the machinery during the period of the petitioner's ownership amounted to $3,877. On the sale of the machinery the petitioner sustained a loss of $1,700.

In his income tax return for 1926 the petitioner took as a deduction against ordinary income the amount of $45,233.75. This amount was composed of $1,700 representing the loss sustained on the machinery sold in that year and $43,533.75 which was the amount computed by the petitioner as the loss on the 750 shares of the stock of the Commission Co. growing out of the transaction of July 9, 1926. The amount of $43,533.75 represents the difference between the cost of the stock, $75,000, and the total of the note for $1,600 and one half the value of the mill in July 1926, $29,866.25.

In determining the deficiency here involved the respondent disallowed the amount of $45,233.75 as a deduction against ordinary income, treated it as a capital net loss and allowed 12½ percent thereof as a deduction against the petitioner's total tax liability.

For 1926 the petitioner had no capital gains and no capital losses except the ones here in controversy.

The respondent contends that in determining the deficiency he erred in treating the transaction between the petitioner and Dorman on July 9, 1926, as a sale by the petitioner of his stock to Dorman and urges that the petitioner sustained no loss on the stock in 1926, since the transaction was not consummated until 1927. The

petitioner contends that the transaction of July 9, 1926, represented a completed sale and that the loss on the stock was sustained in 1926. In support of his position the petitioner urges that the parties intended that title to the stock should pass to Dorman on July 9, 1926.

On July 9, 1926, the petitioner and Dorman had a lengthy conference in the office of the petitioner's attorney respecting the sale of the stock. During this conference the petitioner endorsed the certificates representing the stock and handed them back to his attorney, in whose custody and possession they had been for some time. The certificates were not delivered to Dorman at that time, although he was present, nor is there anything in the record to indicate that the petitioner offered or was willing to deliver them to him at that time. The certificates were to be retained by the petitioner's attorney and held by him pending the performance of one of the following by Dorman: (1) The formal transfer of a one-half interest in the mill to the petitioner, or (2) the sale of the mill and the payment of one half of the proceeds thereof to the petitioner, or (3) the formation of a new corporation, the transfer of the mill to it for stock and the issuance of a portion of such stock to the petitioner. Upon the compliance by Dorman with one of the foregoing requirements the attorney was to deliver the stock certificates to him. On July 9, 1926, the Commission Co. was the owner of the mill and legal title thereto stood in Dorman's name as trustee for the company. Under these circumstances it is clear that some action on the part of the Commission Co., which was not a party to the transaction between the petitioner and Dorman, was necessary before Dorman could be in a position to demand delivery of the stock, which as a matter of fact was not delivered by the attorney until some time after 1927. The necessary corporate action was not taken until in February 1927, when the Commission Co. transferred the mill to the newly organized corporation, Dorman Mills, for capital stock therein, a portion of which was distributed to the petitioner at or about that time. While the petitioner testified that after July 9, 1926, he considered Dorman to be the owner of the stock, that he (petitioner) no longer had any interest in the Commission Co., and that he considered himself to be the owner of a one-half interest in the mills, we are unable, after giving due consideration to all of the other evidence, to conclude that the transaction entered into between petitioner and Dorman on that date constituted a sale. The evidence is clear that Dorman was not to receive the stock until he had complied with one of the three requirements heretofore set forth. Under such circumstances the mere endorsement of the stock certificates by the petitioner and their return to the place where he had theretofore kept them, with the understanding that

upon the performance of one of three requirements by Dorman they would be delivered to him, does not, we think, operate to transfer title to the stock to Dorman prior to his performance. In *Charles W. Dahlinger*, 20 B.T.A. 176; affd., 51 Fed. (2d) 662; certiorari denied, 284 U.S. 673, we said:

> The distinction between a contract to sell and a sale is fundamental in the law of sales, as is pointed out in Williston on Sales, 2d ed., vol. 1 ch. 1, where the following definitions are given:
>
>> A contract to sell goods is a contract whereby the seller agrees to transfer the property in goods to the buyer for a consideration called the price.
>>
>> A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.
>>
>> \*       \*       \*       \*       \*       \*       \*
>>
>> The distinction is some times expressed by the terms "executory" and "executed" sales. Whether a bargain between parties is a contract to sell or an actual sale, depends upon whether the property in the goods is transferred. . If it is transferred, there is a sale, an executed sale, even though the price be not paid.
>
> Sales and contracts to sell may both be subject to conditions expressed or implied, and conditions may be conditions subsequent or conditions precedent. A condition precedent requires that something shall happen prior to the vesting of the property in the buyer. A condition subsequent divests by its happening a title which has already vested.
>
> \*       \*       \*       \*       \*       \*       \*
>
> \* \* \* Although a contract to sell is consummated when the parties execute it, a sale, even where the subject of a contract, is incomplete and imperfect until title passes. But a sale is complete when title passes. At that moment both parties to the sale achieve what they set out to accomplish by the sale. A seller who formerly had property which he desired to sell, thereafter had that property no longer. He thereupon exchanged his right and title to the property for the purchase price or the purchaser's promise to pay it. The property thereafter belonged to the purchaser and he had what he did not have before, an obligation to pay for it. The passing of title irrevocably and finally changes the rights of the parties to a sale.

From the evidence before us we do not think it was the intention of the petitioner that the title to the stock should pass from him to Dorman prior to performance by Dorman. Consequently the agreement of July 9, 1926, was a contract to sell and not a sale. Dorman not having complied with any of the requirements in 1926 and title to the stock not having passed from the petitioner in 1926, there was no sale in that year; consequently, the petitioner did not sustain in that year any loss on the stock. The contention of the respondent as to this item is sustained.

During the taxable year the petitioner sold at a loss of $1,700 certain machinery acquired in 1923. He contends that this loss is deductible from ordinary income and is not to be treated as a capital net loss under the provisions of section 208 (c) of the Revenue Act of 1926, as was done by the respondent. The respondent contends

that his action in treating the loss as a capital net loss is correct and should be sustained.

Section 208 of the Revenue Act of 1926 provides in part as follows:

(a) For the purposes of this title—

\*     \*     \*     \*     \*     \*     \*

(2) The term "capital loss" means deductible loss resulting from the sale or exchange of capital assets;

\*     \*     \*     \*     \*     \*     \*

(6) The term "capital net loss" means the excess of the sum of the capital losses plus the capital deductions over the total amount of capital gain;

\*     \*     \*     \*     \*     \*     \*

(b) In the case of any taxpayer (other than a corporation) who for any taxable year derives a capital net gain, there shall (at the election of the taxpayer) be levied, collected and paid, in lieu of the taxes imposed by sections 210 and 211 of this title, a tax determined as follows:

A partial tax shall first be computed upon the basis of the ordinary net income at the rates and in the manner provided in sections 210 and 211, and the total tax shall be this amount plus 12½ per centum of the capital net gain.

(c) In the case of any taxpayer (other than a corporation) who for any taxable year sustains a capital net loss, there shall be levied, collected, and paid, in lieu of the taxes imposed by sections 210 and 211 of this title, a tax determined as follows:

A partial tax shall first be computed upon the basis of the ordinary net income at the rates and in the manner provided in sections 210 and 211, and the total tax shall be this amount minus 12½ per centum of the capital net loss; but in no case shall the tax under this subdivision be less than the taxes imposed by sections 210 and 211 computed without regard to the provisions of this section.

The petitioner contends that since he had no capital gains during the taxable year, but only a loss, such loss is a capital loss and not a "capital net loss" within the meaning of that term as used in section 208 (c) of the act, and urges that the loss is allowable as a deduction in full against ordinary income and is not to be limited to 12½ per centum as provided in section 208 (c).

In *Piper* v. *Willcuts*, 64 Fed. (2d) 813; affirming 55 Fed. (2d) 397, the essential facts were practically identical with those in the instant case. In that case the taxpayer sold certain capital assets at a loss and deducted the amount thereof from ordinary income. This was the only transaction involving capital assets that the taxpayer had during the year, hence he had no capital gains. The respondent there, as here, determined the taxpayer's tax liability under the provisions of section 208 (c) of the Revenue Act of 1926. The taxpayer there contended that the capital net loss with which the statute dealt was where there had been sales or exchanges of capital assets at both gain and loss resulting in an amount of loss greater than the amount of gain; that where the transactions in capital assets all resulted in losses the statute was inapplicable and

the taxpayer was entitled to deduct the amount of losses from ordinary income. The court, after reviewing the legislative history of subdivision (c) of section 208, found that the purpose of the subdivision was to limit the deduction allowable for capital losses to the amount of 12½ per centum thereof and held that the loss in controversy was a capital net loss within the meaning of that term as used in subdivision (c). The court pointed out that while the term "capital net loss" meant the excess of the sum of the capital losses plus the capital deductions over the total amount of capital gain, if any, the absence of any capital gain served to make greater the amount of the capital loss.

We think the holding of the court in the *Piper* case is sound and upon that authority the contention of the petitioner is denied.

The petitioner contends that if he had had only capital gains during the taxable year he would have had an option under subdivision (b) of section 208 of treating the amount thereof as subject to tax at 12½ per centum or as treating it as ordinary gains or income, and that since he had only a capital loss he had an option as to how it should be treated. In *Hallie D. Elkins*, 24 B.T.A. 572, which involved subdivision (c) of section 208 of the Revenue Act of 1924, the provisions of which are identical with those of section 208 (c) of the Revenue Act of 1926, we held that the taxpayer was not given any election as to how capital net losses are to be treated in determining tax liability. We think our holding in that case is applicable here and the contention of the petitioner is accordingly denied.

*Judgment will be entered under Rule 50.*