H. S. AND W. K. VANDERBILT, EXECUTORS OF THE ESTATE OF ALVA E. BELMONT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 80650. Promulgated October 1, 1936.

*Hugh C. Bickford, Esq.*, for the petitioners.
*John W. Smith, Esq.*, for the respondent.

### OPINION.

VAN FOSSAN: This proceeding was brought to redetermine a deficiency in the estate tax of the estate of Alva E. Belmont in the sum of $31,425.13. The petitioner asserts that the respondent erred:

(1) In disallowing a deduction of $100,000 representing a legacy bequeathed to the National Woman's Party by the decedent, Alva E. Belmont.

(2) In disallowing a deduction as a debt against the decedent's estate of the sum of $522.19, the expenses of a prize essay contest which Alva E. Belmont agreed to pay.

The following facts are found from the stipulation filed by the parties:

The petitioners are the duly appointed and acting executors of the estate of Alva E. Belmont, deceased. The notice of deficiency determined a deficiency of $31,425.13 in Federal estate tax liability against the estate of the deceased, of which $10,855.64 may be eliminated by credit for state, estate, inheritance, legacy or succession taxes pursuant to the provisions of section 301 (b) of the Revenue Act of 1926, as amended by section 802 of the Revenue Act of 1932.

The decedent died January 26, 1933, leaving a will which, among other bequests, bequeathed $100,000 to the National Woman's Party in the following terms:

THIRD: I give and bequeath to NATIONAL WOMAN'S PARTY, a corporation organized and existing under and by virtue of the laws of the District of Columbia, United States of America, the sum of ONE HUNDRED THOUSAND ($100,000.00) DOLLARS.

The decedent was internationally known as a leader in the movement for the establishment of women's rights and the elimination of legal, social, and economic restrictions which placed women in an inferior position. Her zeal to right these wrongs and to overcome the prejudice against a moral, economic, and social equality between the sexes, led her to encourage and to support many movements for the improvement of the state of woman. She was a leader in the movement which resulted in the adoption of the Nineteenth Amendment to the Constitution of the United States on August 18, 1920. With others who had worked with her upon a national scale for the adoption of such constitutional amendment, she became convinced that the franchise alone would not remove existing legal and economic handicaps since the average woman was ignorant of their existence and effect. A great campaign to instruct women in such matters became the ideal of this group and the National Woman's Party, hereinafter called the Party, was formed to conduct this campaign on a national scale. One of the leaders in such formation was the decedent, who became chairman of the Party and served as such until the time of her death.

The Party was incorporated September 19, 1918, under chapter XVIII, subchapter III of the Code of Laws of the District of Columbia, which provides:

Any three or more persons of full age, citizens of the United States, a majority of whom shall be citizens of the District, who desire to associate themselves for benevolent, charitable, educational, literary, musical, religious, scientific or missionary purposes, including societies formed for mutual improvement or

for the promotion of the arts, may make, sign and acknowledge * * * and file in the office of the Recorder of Deeds, to be recorded by him, a certificate in writing * * *.

Upon filing their certificate the persons who shall have signed and acknowledged the same shall be a body politic and corporate * * *.

The objects of the Party, as set forth in the certificate of incorporation, are as follows:

The term for which the society is organized is perpetual.

The particular business and objects of the society are educational and for mutual improvement and especially by the preparation and circulation of books, newspapers, the delivery of speeches, lectures and such other proper means as in the judgment of the society will promote that end, to educate public sentiment to a recognition of the equality of the sexes in all their rights, privileges and obligations.

The pertinent portions of the constitution and bylaws of the Party in effect in 1933 are as follows:

### Article II: Object

The object of this organization shall be to secure for women complete equality with men under the law and in all human relationships.

### Article III: Members

Section 1. Membership shall be open to all women who support the object of this organization and comply with provisions for membership of State organizations, or of the National organization.

Section 2. Any group of women wishing to further the objects of this organization may form a branch of the National Woman's Party, by submitting a constitution to the National Council and receiving the approval of that Council. Upon such approval, the branch shall become a part of the organization of the National Woman's Party of the State in which it is organized. There shall be no more than one state organization in each state.

   *       *       *       *       *       *       *

### Article XI: Dues

Section 1. Each State organization shall pay to the Treasury of the National organization before June 1st of each year twenty-five cents for each member belonging to such organization.

Section 2. A member of the National Woman's Party may become a National Life Member by payment of $1,000 to the National Treasury: a National Sustainer by the payment of $5,000, to the National Treasury; a National Endower by payment of $5,000 to the National Treasury. The dues for other members shall be $1.00 payable to the local, state branch or National Headquarters: $10.00 for active membership, $2.00 of which must be sent to National Headquarters.

The designation and duties of the officers, the establishment of the national council, standing committees, national conferences and conventions, state organizations, and other routine matters were also provided for in the document.

Following the adoption of the Nineteenth Amendment the Party reorganized on a permanent basis to work for the complete freedom of women in all lines. During 1921 the decedent donated a building opposite the National Capitol to the Party as permanent headquarters.

The Party from 1922 to 1934 has conducted a national campaign for the establishment of woman's rights and the elimination of handicaps. In 1923 a weekly paper, subsequently issued biweekly, was established and has since been published. The magazine collected and published all facts relating to the campaign. Members of the Party conducted exhaustive research and prepared bibliographies of all books and literature found relating to the subject of woman's rights. The research developed the statutes of each of the forty-eight states which restricted or handicapped woman. In making this investigation constitutional provisions, statutes, and court decisions of the several states bearing upon women were examined. The results of this study were published in pamphlets and circulars for each state. When noteworthy statutes were passed, such as the Wisconsin Equal Rights Law, special pamphlets were issued, such as "What Women Won in Wisconsin."

Special pamphlets, circulars, and notices were issued and widely circulated to make known the facts regarding various particular subjects relating to the status of women and the discrimination seemingly made against them. The Party also encouraged the publication of articles in various magazines and frequently when such articles appeared reprints thereof were made and distributed throughout the Nation.

The attention of the country was turned to the equal rights question by publicity and organizing compaigns conducted by the Party. As a part of these campaigns great pageants have been organized, such as one at Seneca Falls, New York, to commemorate the seventy-fifth anniversary of the first equal rights convention; one in the Garden of the Gods in Colorado as part of the conference of the western states; one at Meadowmount in the Adirondacks in memory of Inez Milholland; one in Detroit as a part of the mid-western conference of Woman's Party leaders; and one at Washington to dedicate the national headquarters. Many thousands of people from all parts of the country attended these pageants, which dramatized the struggle for woman's freedom and at which speeches were arranged to explain and advance the cause. Sectional and regional conferences were periodically held, as well as monthly and weekly, of state branches, to advance equal rights for woman, at which appropriate discussion was held and at which prominent men and women spoke on instructive subjects.

The Party has drafted many bills for the state legislatures designed to equalize control of children, of property, of earnings; to make contractual rights, citizenship rights and inheritance rights equal; to provide equal opportunities in the schools and universities, in professions and industries, and in government service; to provide equal pay for equal work; to assure equal right to individual identity after marriage; to equalize moral standards. Facts and information in support of these bills have been supplied by the party and approximately 100 of such laws have been passed by the state legislatures. The Party has also supplied facts, speakers and support for the adoption of a joint resolution proposing an amendment to the Constitution of the United States, introduced in both Houses of Congress, of the Seventy-third Congress, first session, providing:

Men and women shall have equal rights throughout the United States and every place subject to its jurisdiction.

The funds of the Party have been derived from dues of its members and from contributions which, between March 15, 1922, and December 31, 1934, amounted to $1,165,231.40, of which $1,164,647.80 has been expended to defray the costs of the foregoing activities, leaving a balance on hand at December 31, 1934, of $583.60. The corporation is not organized for profit and no part of its earnings inured to the benefit of any private shareholder or individual.

On December 16, 1931, Alva E. Belmont sent a letter to the national chairman of the Students Councils of the Party, stating that she was renewing her offer of $500 to use as a prize to be given by the president of the Party to women college students of the country and increasing the prize to $500 as a first prize and $200 as a second prize. The prizes were to be given for essays dealing with the proposed equal rights amendment and the decedent agreed to pay all necessary expenses connected with the publicity, clerical costs, and traveling expenses of prize winners.

The essay contest was announced in the Party magazine "Equal Rights" on May 14, 1932, and was open to undergraduate students in colleges and schools throughout the land. On July 8, 1933, the winners were announced and subsequently came to Washington for the formal awards. The expenses of the contest, aggregating $528.61 were not paid at the date of the decedent's death. The executors of her estate paid $522.19 of such expenses and claimed the payment as a deduction. The respondent disallowed the deduction on the ground that the decedent's liability was not incurred or contracted "for an adequate and full consideration in money or money's worth" within the meaning of section 303 (a) (1) of the Revenue Act of 1926.

The primary issue before us is whether or not the National Woman's Party is a corporation organized and operated exclusively

for educational purposes as contemplated by the provisions of section 303 (a) (3) of the Revenue Act of 1926.[1] If it is, the $100,000 bequeathed to it by Alva E. Belmont must be deducted from the gross value of her estate in order to determine its proper net value as a basis for assessing the estate tax. It is stipulated that no part of the net earnings inures to the benefit of any private stockholders or individuals.

To entitle petitioners to the deduction claimed on account of the bequest to the National Woman's Party it must appear that the corporation in question was "organized and operated exclusively" for educational purposes. Respondent contends that it fails to satisfy the statute in either respect. Though the avowed purpose, as found in the certificate of incorporation, is stated to be educational, it is to be noted that the constitution of the organization sets forth that the object is "to secure for women complete equality with men under the law, and in all human relationships." The accomplishment of this goal would require more than education—it would require the adoption of an amendment to the Federal, and many State, Constitutions and the passage of legislation both by the Congress and state legislatures. Thus it may seriously be doubted whether the stated object of the corporation comes within the scope of education.

When we pass to the activities of the corporation the real situation becomes clear. The corporation was not "operated exclusively" for educational purposes. In the stipulation of facts we find that the Party "conducted a campaign for the establishment of women's rights and the elimination of handicaps"; it staged pageants and sponsored speeches "to explain and advance the cause"; it "drafted many bills for State legislatures" and supplied "facts and information in support of these bills"; it "supplied facts, speeches and support for the adoption of a Joint Resolution proposing amendment to the Constitution of the United States" granting equal rights. The above quotations evidence, not the education of women nor of the electorate, but

---

[1] SEC. 303. For the purpose of the tax the value of the net estate shall be determined— (a) In the case of a resident, by deducting from the value of the gross estate—

\* \* \* \* \* \* \*

(3) The amount of all bequests, legacies, devises, or transfers, to or for the use of the United States, any State, Territory, any political subdivision thereof, or the District of Columbia, for exclusively public purposes, or to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, or to a trustee or trustees, or a fraternal society, order, or association operating under the lodge system, but only if such contributions or gifts are to be used by such trustee or trustees, or by such fraternal society, order, or association, exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals. The amount of the deduction under this paragraph for any transfer shall not exceed the value of the transferred property required to be included in the gross estate; \* \* \*

the active advocacy of legislation necessary to the removal of barriers to equality of the sexes. In this activity the Party transgressed the boundaries prescribed by the statute and forwent its advantages. In *John H. Watson, Jr.*, 27 B. T. A. 463, after discussing certain cases also pertinent here, we observed:

In the instant case the members of the League would perhaps paraphrase the purpose of the League as "the bringing about of better local government and the election of better fitted men to office." But in the very statement they assume the soundness of their conclusions and the accuracy of their judgment of fitness. Furthermore, they impute that those not in agreement with the League are mistaken in their philosophy and unsound in their judgment. Any organization such as that under consideration is obviously partisan in the broad sense of that term. It has its own concept of what constitutes good government and its own criteria by which to judge candidates for office, and it suggests its conclusions to others. To this extent it is an advocate. And though advocacy may be but a natural expression of sincerity of belief, it also tends to indicate the point at which education ends and, in that this, political activity begins.

On the facts before us we are not convinced that the Citizens League of Cleveland was organized and operated exclusively for educational purposes. The classification of candidates and the publishing as paid advertisements of such classification went beyond the education of the public. The obvious purpose of such advertisements was to promote the election of "preferred" candidates. This was a political activity, however laudable the aim in the opinion of the members of the League. Similarly, the League presented its conclusions and, by proper inference, it recommended actions to the legislative authority. Here again it assumed the role of an advocate in political matters.

The reasoning underlying our ruling that the contribution was not deductible in the *Watson* case is equally pertinent here. In *Leubuscher* v. *Commissioner*, 54 Fed. (2d) 998 (affirming 21 B. T. A. 1022), the court approved the disallowance of a contribution to a club organized "to advocate the Henry George doctrine" and promote social intercourse "among single tax people", while approving the deduction of a legacy to a foundation where "the money was to be used for teaching, expounding and propagating" the ideas of Henry George but "not for seeking the passage of legislation." See also *Henriette T. Noyes*, 31 B. T. A. 121, where contributions to two leagues of women voters were disallowed. The case of *Charles W. Dahlinger*, 20 B. T. A. 176, relied on by petitioners was essentially different from the present case in its facts.

We find that the National Woman's Party was not organized and operated exclusively for educational purposes and, therefore, the deduction of the bequest from the gross estate was properly denied.

The second issue involves the deductibility of $522.19, paid by the petitioners to the Party to reimburse it for the expenditures made in connection with the Belmont prize essay contest, pursuant to the promise made by Alva E. Belmont during her lifetime.

1040

In *Boston Safe Deposit & Trust Co. et al., Executors,* 30 B. T. A. 679, we had a similar situation before us. There we held that such payments were not made for adequate and full consideration in money or money's worth within the purview of the statute.[2] The decision in that case is applicable to the facts here. See *Charles B. Bretzfelder et al., Executors,* 32 B. T. A. 146; *Robert A. Taft, Executor,* 33 B. T. A. 671. The amount is not deductible.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

[2] Section 303 (a) (1) of the Revenue Act of 1926 is as follows:

"(1) Such amounts for funeral expenses, administration expenses, claims against the estate, unpaid mortgages upon, or any indebtedness in respect to, property (except, in the case of a resident decedent, where such property is not situated in the United States), to the extent that such claims, mortgages, or indebtedness were incurred or contracted bona fide and for an adequate and full consideration in money or money's worth  *  *  *"